IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

BARBARA GAIL WILLIAMS                                                PLAINTIFF

V.                                      NO. 4:08cv00573 JWC

MICHAEL J. ASTRUE,                                                    DEFENDANT
Commissioner, Social
Security Administration

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Barbara G. Williams,[1] seeks judicial review of the denial of her claim for

supplemental security income (SSI) benefits.  Both parties have submitted briefs (doc. 9,

10).  For the reasons that follow, the Court[2] **affirms** the Commissioner's decision that

Plaintiff is not disabled within the meaning of the Social Security Act and regulations and,

therefore, is not entitled to SSI benefits.


I.

The Commissioner's denial of benefits must be upheld upon judicial review if the

decision is supported by substantial evidence in the record as a whole.  *Wiese v. Astrue*,

552 F.3d 728, 730 (8th Cir. 2009); *see* 42 U.S.C. §§ 405(g), 1383(c)(3).  Substantial

evidence is "less than a preponderance but is enough that a reasonable mind would find

it adequate to support the conclusion."  *Wiese*, 552 F.3d at 730.  In its review, the Court

should consider evidence supporting the Commissioner's decision as well as evidence

---

[1]Also known as Barbara Gail Brice, Barbara Gail Preston, Barbara Gail Willis, and
Barbara Gail Smith-Preston.

[2]The parties have consented to the jurisdiction of the United States Magistrate Judge
(doc. 8).

detracting from it.  *Id.*  That the Court would have reached a different conclusion is not a sufficient basis for reversal; rather, if it is possible to draw two inconsistent conclusions from the evidence and one of these conclusions represents the Commissioner's findings, the denial of benefits must be affirmed.  *Id.*

II.

In her application documents and at the hearing before the ALJ, Plaintiff alleged inability to work since September 2, 2004,[3] due to poor vision, depression, hallucinations, memory loss, blackouts, asthma, high blood pressure, and pain in her head, neck, back, stomach, chest, hands, legs, knees and feet.  (Tr. 88, 90, 109, 491, 498-502.)  Plaintiff was forty-two years old at the time of the hearing, with an eighth grade education.  (Tr. 486, 491.)  She has past self-employment making and selling crafts.  (Tr. 492-97.)

Under the applicable law, a claimant is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The regulations provide a five-step sequential process to determine whether a claimant is disabled.  *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Basically, those procedures require the ALJ to take into account whether a claimant is working, whether the claimant's physical or mental impairments are severe, whether the impairments meet or equal an impairment listed in

_____

[3]Plaintiff initially alleged an onset date of April 1, 1992 (Tr. 76), but amended it at the hearing to September 2, 2004 (Tr. 486).

the regulations, whether the impairments prevent a resumption of work done in the past, and whether they preclude any other type of work. *Id.*

Here, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. The ALJ next determined, at step two, that Plaintiff suffered from severe impairments related to a history of depressive disorder (not otherwise specified) with cocaine dependency (in apparent remission), a history of asthma, a history of tension/migraine headaches, a history of left knee patellofemoral chondrosis with medial and lateral meniscus tears, and a history of mild disc bulging and degenerative changes in the lumbar spine with normal nerve conduction/EMG of the four extremities. The ALJ found that none of her impairments, individually or in combination, equaled a step-three listed impairment as contained in the regulations. At step four, the ALJ found that Plaintiff was unable to perform her past relevant work, but retained the residual functional capacity (RFC) to perform light work, with certain restrictions. At step five, after taking testimony from a vocational expert and considering Plaintiff's age (younger individual), education (limited), work experience and RFC, the ALJ found there were a significant number of jobs in the local, regional and/or national economy which Plaintiff could perform. The ALJ thus concluded that Plaintiff was not disabled. (Tr. 15-25.) Plaintiff pursued administrative review with no success, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-8.)

Plaintiff argues that the ALJ erred (1) in failing to find at step three that Plaintiff's impairments met the requirements for automatic disability based on mental retardation under Listing 12.05(C); and (2) in assessing her RFC in light of her physical and mental limitations.

III.

If a severe impairment is of the degree set forth in a listing and meets the twelve-month durational requirement, the claimant is presumptively disabled and no further inquiry is needed. *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003); *see* 20 C.F.R. § 416.925. To meet the required level of severity for mental retardation, a claimant must show "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., ... before age 22." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05. Level of intellectual functioning requirements are satisfied by evidence of a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function," *id.* § 12.05(C).

In his decision, the ALJ acknowledged his step-three responsibility to consider whether Plaintiff's impairments or combination of impairments met or medically equaled the criteria of a listed impairment. (Tr. 16.) He then specifically found, "after a thorough review of the evidence," that no evidence showed the existence of any impairment meeting the listing criteria, that no treating or examining physician mentioned findings equivalent in severity to the listing criteria, and that the state agency medical consultants who evaluated the issue had reached the same conclusion. (Tr. 17-18.) The fact that the ALJ did not elaborate on his conclusions and did not specifically mention § 12.05(C), or any other particular listing, does not require reversal where, as here, the record supports his overall conclusion that Plaintiff failed to make the requisite step-three showing. *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006).

4

Plaintiff has the burden of showing that she meets a listing. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). To do so, she points to IQ test results obtained by Dr. John W. Rago, a licensed psychologist, who administered the WAIS-III test on February 24, 2005. The test yielded a verbal IQ of 65, a performance IQ of 60, and a full-scale IQ of 60, undeniably within the listing range. (Tr. 238.) The Commissioner counters that these test results are of questionable validity, there is no evidence of significantly sub-average intellectual functioning with deficits in adaptive functioning, and the evidence as a whole does not support a claim of mental retardation.

An ALJ is not required to accept IQ scores that an examiner finds to be invalid, scores that are rendered suspect by other evidence in the record, or scores that are inconsistent with a claimant's demonstrated activities and abilities as reflected in the record as a whole. *Clay v. Barnhart*, 417 F.3d 922, 929-30 (8th Cir. 2005); *Johnson*, 390 F.3d at 1071; *Miles v. Barnhart*, 374 F.3d 694, 699 (8th Cir. 2004); *see* § 12.00(D)(6)(a) (intelligence test results are "only part of the overall assessment" regarding mental retardation). It is the ALJ's responsibility as the decision-maker to resolve conflicts in the evidence regarding the validity of IQ scores. *Clay*, 417 F.3d at 930.

Here, in discussing Plaintiff's "history/treatment for psychologically based symptoms" (Tr. 22-23), the ALJ acknowledged the IQ scores obtained by Dr. Rago but declined to use them as a basis for finding mental retardation as an impairment. The record supports that decision.

First, as noted by the ALJ, Dr. Rago specifically reported that the IQ results obtained through his testing "did not seem to match [Plaintiff's] presentation or level of conversation." Dr. Rago further stated that the scores were "considered to be an

underestimate of [Plaintiff's] current intellectual functioning" and that her conversation "showed a higher level of intelligence than her Full Scale IQ would indicate." He stated that, in his evaluation, she appeared to have been "open, but gave what appeared to be less than her best effort as she tended to give up easily" and "there is possible exaggeration or malingering."[4]  (Tr. 238, 240.)

Dr. Rago found that Plaintiff's thoughts were logical, her speech was unremarkable, and her affect and mood were normal.  She was oriented to time, place, person and situation, and was able to perform simple addition and subtraction.  She spoke with "good fluency" but had some "expressive/receptive problems due to limited vocabulary and comprehension."  Her effort and persistence were "poor," her pace was "average," her attention and concentration were "adequate," and her interest, motivation, work habits and rapport were "fair."  He said she claimed to have visual problems but was able to do visual tasks adequately, even though she did not bring her reading glasses.  He observed no evidence of lability, confusion, disorientation, deficits in judgment or word-finding deficits. (Tr. 237-38.)

In evaluating Plaintiff's adaptive functioning, Dr. Rago found that she was able to communicate effectively and be understood, able to attend to her activities of daily living with occasional assistance, had no observable physical problems that would interfere with adaptive functioning, and seemed impaired in her ability to concentrate as she "gives up

---

[4]Malingering is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding work or obtaining financial compensation.  American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 739 (4th ed., Text Rev. 2000) (*DSM-IV-TR*).

easily." He said she would be able to manage funds without assistance, telling him, "My husband and me do it together. I keep track of the bills." Although Dr. Rago was able to identify two or more areas with significant limitations in adaptive functioning, he said this was based only on Plaintiff's own reports, as opposed to objective findings. He expressly stated that her adaptive functioning was not consistent with a diagnosis of mental retardation. (Tr. 239-40.) Instead, his diagnoses were psychotic and mood disorders (NOS) as reported by Plaintiff, antisocial personality disorder, and "mild mental retardation (suspect) rule out." (Tr. 239.)

Other evidence in the record corroborates Dr. Rago's conclusion regarding mental retardation.

As referenced by the ALJ, the record contains the assessments of Jay Rankin, M.D., and Dr. Dan Donahue, state agency medical consultants who reviewed the existing record in 2005 and did not find evidence to support a finding of mental retardation under the diagnostic criteria of Listing 12.05. (Tr. 245-59.) They also concluded that Plaintiff's activities of daily living were mildly limited, her social functioning and concentration, persistence and pace were moderately limited, and she had no episodes of decompensation. (Tr. 255.) The regulations recognize that state agency medical and psychological consultants are "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation." 20 C.F.R. § 416.927(f)(2)(i).

Plaintiff went to Professional Counseling Associates (PCA) on two occasions in early 2007 for treatment of depression with psychotic features. (Tr. 475-80.) At her intake interview on January 12, 2007, the social worker observed that Plaintiff's sentence structure and thought content were logical and goal-directed, her speech was delivered at

a normal rate and volume, her insight and judgment were poor, and her intelligence was estimated to be "average or slightly below." (Tr. 479.) The social worker noted "an extensive work history," including construction, home interior design, car detailing and wedding planner. (Tr. 478.) Andrea Eberle, M.D., performed a psychiatric evaluation on January 23, 2007, observing that Plaintiff was cooperative, with logical and goal-directed sentence structure and thought content, thought processes that appeared to be slowed down, decreased insight and judgment, depressed mood and affect, and "somewhat impaired" memory. Dr. Eberle noted that Plaintiff was oriented to person, place and time, and estimated her intelligence to be below average. (Tr. 476.) Although Dr. Eberle diagnosed severe depression and a "past presumed diagnosis of bipolar disorder," there was no mental retardation diagnosis. (Tr. 476.)

Significantly, Plaintiff testified that she owned and operated her own handicraft business out of her home for several years, making and selling pillows, curtains, table centerpieces, decorated fans, and candle holders. She advertised through flyers and business cards made by a friend, took orders from customers, set the prices, created a pattern, purchased materials to make the items, kept up with the receipts for purchased materials, made the items herself, and saw that her customer receipt book was turned over to "the income tax place." She said her daughter filled out the receipts and helped her keep track of the money, and other family-members helped with the cutting, sewing and gluing if needed. (Tr. 492-97, 508-09, 512-16.)

After listening to Plaintiff's testimony at the administrative hearing regarding her craft business, the vocational expert testified that her work was that of a craft director, which

was highly skilled work with an SVP of 7,[5] or that of a sales representative, SVP 5.  (Tr. 510-11.)  The expert acknowledged that Plaintiff's work activity was clearly above her educational level.  (Tr. 512.)  The ALJ stated that "it certainly shows [she is] not mentally retarded" and "has some intelligence," in that she was able to operate an ongoing business with some assistance, work with customers, handle inventory, and "make a reasonable living."  (Tr. 513-14.)

When asked at the administrative hearing if she could read and write she said "not too well," and she said she did not know how to write a sentence and had trouble comprehending what she is reading.  (Tr. 492, 497-98.)  She said she could count money "a little bit," but could not add and subtract.  (Tr. 492.)  In her evaluation with Dr. Rago, she was able to perform single digit addition and subtraction problems, count backwards from 20 to 1, and repeat seven digits forward and three digits backward.  (Tr. 237.)  She was able to obtain and maintain a valid driver's license.  (Tr. 490-91.)

As noted by the ALJ (Tr. 23), Plaintiff completed a disability form herself on September 15, 2004, reporting that she could shop for groceries and clothes, attend to banking and postal errands, prepare simple meals, pay bills, and use a checkbook.  (Tr. 107-08.)  Plaintiff signed the form without evidence of having sought or required assistance with reading, understanding or completing the form.  (Tr. 110-11.)  The ALJ found that this

---

[5]The Dictionary of Occupational Titles (DOT) assigns each occupation a number that reflects the job's specific vocational preparation (SVP) time, i.e., how long it generally takes to learn the job.  *Fines v. Apfel*, 149 F.3d 893, 895 (8th Cir. 1998); *see* DOT, App. C (4th ed. 1991).  Unskilled work corresponds to an SVP level of 1-2; semi-skilled work to an SVP level of 3-4; and skilled work to an SVP level of 5-9.  Soc. Sec. Rul. 00-4p, 2000 WL 1898704, *3 (S.S.A 2000).

"serves to significantly diminish [her] credibility regarding her overall intellectual and/or academic functioning capabilities."  (Tr. 23.)

During a period of incarceration, Plaintiff was able to competently write up and submit her own medical care requests on numerous occasions between May 2003 and October 2003.  (Tr. 120-22, 128, 133-35, 139-41, 143, 146, 152, 155, 157, 163, 165, 168, 170-71, 174-76, 178, 181-84, 189-92, 194-96.)  The prison records make no mention of possible mental retardation, and her intake mental health screening assessed her level of cognitive functioning as "average."  (Tr. 205.)

Plaintiff reported in her disability forms that, at first, she attended regular classes in school, but ended up in special education.  (Tr. 110.)  She told Dr. Rago that she left school in eighth grade because she "had too many kids" and had gotten a job at Conagra (Tr. 236), and she reported to the PCA social worker that she discontinued her education after obtaining employment (Tr. 478).  This indicates that, although she performed poorly in school, her decision to leave was not necessarily due to a mental deficiency. Additionally, other than her poor performance and early exit from school, no other evidence in the record suggests onset of an impairment before age 22, which weighs against a finding of mental retardation under the listing criteria.  *See Clay*, 417 F.3d at 929.

This record, as a whole, constitutes substantial evidence to support the Commissioner's conclusion that Plaintiff did not meet the level of functioning requirements for mental retardation under Listing 12.05(C).  Because she failed to demonstrate valid IQ scores within the specified range, the Court need not address Plaintiff's argument regarding the listing's second requirement, i.e., that she suffers from other mental and

physical impairments which impose additional, significant work-related functional limitations.

IV.

Plaintiff also argues that, given her mental and physical impairments, the Commissioner improperly determined that she retained the RFC for performing work that exists in substantial numbers in the economy. She refers to her knee, back, and neck problems, as well as her asthma, and her mental illness diagnoses of bipolar disorder, severe depression, and psychotic, mood and antisocial personality disorders.

RFC is defined as "the most [the claimant] can still do" in a work setting "on a regular and continuing basis" despite his or her physical and mental limitations. 20 C.F.R. § 416.945(a)(1), (b) & (c). The ALJ bears the final responsibility for assessing a claimant's RFC at step four of the sequential evaluation, based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007); 20 C.F.R. §§ 416.927(e)(2), 416.945(a)(3).

Here, the ALJ found that Plaintiff retained the following physical RFC: (1) the ability to lift/carry and push/pull up to twenty pounds occasionally and ten pounds frequently; (2) the ability to sit six to eight hours in an eight-hour workday (one to two hours continuously), or with a sit-stand option, due to a limited ability to stand and/or walk; (3) should avoid temperature extremes and excessive exposure to chemicals, dust, fumes and humidity; and (4) would experience mild to moderate pain with the use of over-the-counter and/or prescription medications. The ALJ assessed the following mental RFC: (1) would require

11

simple unskilled or low semi-skilled work, with the ability to understand, remember and follow concrete instructions; and (2) contact with supervisors, co-workers and the public should be superficial.  As examples, the ALJ stated that Plaintiff would have the ability to meet/greet others, make change, and/or give simple instructions and directions.  (Tr. 18.)

The ALJ said he based his RFC determination on "the entire record" and Plaintiff's history of medically determinable severe impairments, including her statements regarding her symptoms and limitations, the objective medical evidence, the opinion evidence, and other evidence in the record.  (Tr. 18.)

First, he stated that he had evaluated Plaintiff's testimony regarding the severity and debilitating nature of her physical and mental impairments, finding them "unsupported by the record as a whole and, therefore, less than fully credible."  (Tr. 20.)  A claimant's subjective complaints may be discounted if they are inconsistent with the evidence as a whole.  *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007).  The ALJ is in the best position to gauge credibility and is granted deference in that regard as long as he explicitly discredits a claimant's subjective testimony and gives good reasons for doing so.  *Id.* at 696.  *See* 20 C.F.R. § 416.929(c) (listing factors to consider); *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984); Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *3, *5 (S.S.A. 1996).

Listing the applicable factors and law (Tr. 18-19), the ALJ pointed out several specific reasons for his credibility determination: (1) Plaintiff's statement that Paxil made her drowsy, when the medical records failed to show that she had recently been prescribed or had taken this medication (Tr. 19); (2) her extremely limited daily activities and functional

12

abilities as testified to at the administrative hearing[6] (Tr. 19), and contrasted to those reported in her disability questionnaire (Tr. 23); (3) her previous experience as the owner-operator of a handicraft business (Tr. 19); (4) the lack of medical evidence to support severe physical and mental limitations (Tr. 20, 22); (5) her ability to independently complete the disability questionnaire (Tr. 23); and (6) the fact that no physician had stated she was unable to engage in substantial gainful activity or had ever advised her to permanently limit her activities due to her impairments (Tr. 23).  Also relevant to credibility were the ALJ's remarks that this was Plaintiff's sixth application for disability benefits, that she had previously been arrested and incarcerated for eighteen months on drug charges, and that Dr. Rago had assessed possible exaggeration or malingering in his evaluation.  (Tr. 22; *see* Tr. 517.)

Plaintiff does not contest the ALJ's credibility determination or suggest that the above factors were improperly considered or unsupported by the evidence.  Therefore, this Court will defer to the Commissioner's determination that Plaintiff's subjective allegations were not fully credible.

The ALJ next discussed in depth Plaintiff's history/treatment for physically based symptoms (Tr. 20-21) and for psychologically based symptoms (Tr. 22-23).

Regarding her knee, back and neck problems, the ALJ noted that, at a physical examination by a family physician on October 15, 2004, Plaintiff had normal posture,

---

[6]She testified that her daughter helps her with bathing and dressing, her daughter and son do all the cooking, housework and yard work, and she spends her days sitting around and watching TV.  (Tr. 500, 504-06.)  She testified that she could sit 20 minutes, could walk 40 feet, could stand 20 minutes, could lift/carry no more than 10 pounds, could climb no more than two steps, cannot push/pull, cannot read or write well, cannot add or subtract, and cannot see.  (Tr. 492, 497-98, 501-04.)

normal gait, full range of motion in her neck with no reports of tenderness, and full range of motion in all other joints, with normal joints and muscles. (Tr. 209-10.) She underwent a consultative physical examination on December 8, 2004, and she had essentially full range of motion in all joints, with slight reduction noted in the cervical and lumbar spine and the shoulders, elbows and knees, reported abnormal straight-leg raises, and reported right hip pain. (Tr. 268-69.) Her neck was observed to be within normal limits, her gait was described as "fairly normal," and she was unable to squat. (Tr. 267, 269.) The examining physician noted that Plaintiff had "some somatization[7] of symptoms," and he concluded that she would have limitations in her ability to stand for long periods, to walk distances, and to carry "heavy objects." (Tr. 270-71.) A lumbar spine x-ray the same day was within the normal range (Tr. 272), as were January 2005 cervical spine x-rays (Tr. 222-23, 383, 435).

Plaintiff complained of left knee problems aggravated by prolonged walking or standing, and she underwent arthroscopic left knee surgery on August 26, 2005. (Tr. 309, 316-24.) At that time, her right knee also had limited range-of-motion, compression pain, soft tissue pain and swelling. (Tr. 309.) However, after the surgery,[8] there is no evidence that Plaintiff either sought or required ongoing care until June 22, 2006, ten months later. At that time, she sought treatment from Shailesh C. Vora, M.D., a neurologist, who assessed chronic headaches, cervicalgia (neck pain) with swelling and spasm "a little

---

[7]Somatization disorder is characterized by multiple physical complaints that cannot be explained fully by a physical disorder. *The Merck Manual* 1740 (18th ed. 2006).

[8]Plaintiff testified that surgery was performed on both knees (Tr. 507-08); however, the submitted medical records document only the left knee surgery (Tr. 316-24, 341-49).

better," lumbrosacral backache, and depressive disorder.  (Tr. 445-47.)  Dr. Vora reported: that a June 5, 2006 MRI of Plaintiff's lumbar spine revealed mild disc-bulging and degenerative changes, resulting in decreased range of motion, tenderness and muscle spasms of the neck and back; that an April 10, 2006 MRI of the cervical spine was normal except for slight straightening of cervical spinal curvature suggestive of acute muscle spasm; and that nerve conduction/EMG studies of the four extremities on May 25, 2006, were normal.  No knee problems were assessed, and her gait and station were observed to be normal.   Dr. Vora prescribed medications, recommended a heating pad and exercises for the neck and back,  and recommended no lifting over ten pounds.  In seeking treatment for other conditions from July to October 2006 (abdominal pain, vaginitis, high blood pressure, a bad cold),  Plaintiff was repeatedly observed to have a "steady gait."  (Tr. 448-49, 451-56.)   In February 2007, she sought treatment in the emergency room for a "knot" on the left side of her neck that was causing pain.  She was prescribed pain medication and released.  (Tr.  460-64.)

Finally, Plaintiff does have a history of asthma, for which she takes medication, uses an inhaler, and occasionally uses a breathing machine that she borrows from a friend.  (Tr. 500-01.) On December 13, 2004, her average oxygen saturation was 99% on room air with a lowest measured saturation of 99% on room air.  (Tr. 232.)  Chest x-rays were normal in March 2005, August 2005 and February 2007.  (Tr. 299, 351-52, 465.)  There are no records of hospitalizations or non-routine treatment for asthma-related conditions, indicating that it is controlled.

This evidence supports the ALJ's physical RFC determination, as Plaintiff's conditions were either mild or moderate, controlled or controllable by treatment or

medication, or adequately taken into account with the limitations included in the RFC by the ALJ. Although he declined to find her physical problems disabling, the ALJ did not ignore them, finding that Plaintiff would have some controllable pain, that she would be limited in her ability to lift and stand/walk, and that she would have some environmental restrictions due to her asthma. *See Schultz v. Barnhart*, 479 F.3d 979, 983 (8th Cir. 2007) (condition that can be controlled by treatment or medication cannot be considered disabling); *Gregg v. Barnhart*, 354 F.3d 710, 713-14 (8th Cir. 2003) (crucial question is not whether claimant experiences pain, but whether claimant's credible, subjective complaints prevent him from performing any type of work). Significantly, these restrictions are far greater than those assessed by the state agency physicians who reviewed the medical evidence of record and found Plaintiff's physical problems as "not severe." (Tr. 260-61.)

The RFC also adequately accounted for some functional limitations due to Plaintiff's diagnosed mental disorders. The Court has already discussed the evaluations of Dr. Rago and the PCA mental health professionals. Other than those evaluations, the record contains no evidence of ongoing mental health treatment aside from oral medication prescribed on occasion when she sought treatment for physical conditions. (*See* Tr. 447.) Plaintiff told Dr. Rago in February 2005 that she was depressed and suicidal, heard voices, and experienced hallucinations; however, she was taking no medications at that time. (Tr. 236.) Similarly, she was not on any antidepressant or antipsychotic medications in January 2007, when she reported to the PCA psychiatrist that she was having suicidal thoughts, was hearing voices and seeing a green figure, was crying all the time, had a poor energy level, and was having temper outbursts. (Tr. 475-76.) Dr. Vora, a neurologist/psychiatrist who was treating her neurological complaints in June 2006, diagnosed depressive disorder

16

NOS and prescribed Cymbalta, but did not recommend further psychological treatment. (Tr. 447.)

While she related an extensive history of psychiatric treatment and hospitalization since 1979, including "numerous" suicide attempts (Tr. 236-37, 475, 478), this is not documented by any medical records other than those containing her self-reports. Moreover, Plaintiff apparently was able to function and live independently with little or no limitation until the last few years, which undermines her allegations of prolonged, severe mental illness.  She was able to "make a reasonable living" for several years with her craft business (Tr. 236, 514) and worked at several other jobs, including factory work, waitressing, construction, interior design, car detailing and wedding planning (Tr. 309, 317, 478).  She also cared for her six children, including a mentally disabled son.  (Tr. 236, 475-76, 478, 487.)[9]  *See Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (claimant's ability to work in the past with alleged impairments demonstrates they are not presently disabling); *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (claimant not disabled by mental impairment where he worked for years with "cognitive abilities he currently possesses"); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) (claimant's total disability allegation was inconsistent with her daily living activities, including the care of her special needs children, bill paying, laundry, and cooking).

After reviewing Plaintiff's medical records, the state agency medical consultants (Drs. Rankin and Donahue) prepared a mental RFC assessment, finding that her abilities were moderately limited in the following areas: understanding, remembering and carrying

---

[9]In 2007, her children were 28, 27, 25, 24, 18 and 16.  (Tr. 478.)

out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule and maintaining regular attendance; completing a normal workday and workweek and performing at a consistent pace; interacting appropriately with the general public; accepting instruction and responding appropriately to criticism from supervisors; traveling in unfamiliar places or using public transportation; and setting realistic goals and making independent plans.  (Tr. 241-42.)  She had no marked limitations in any areas.  They concluded that she was able to perform work "where interpersonal contact is incidental to work performed, e.g., assembly work; complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete."  (Tr. 243.)

Although the ALJ observed that Plaintiff's past work activity running her own business was highly skilled, he nevertheless limited her to simple unskilled or low semi-skilled work, with the ability to understand, remember and follow concrete instructions, and requiring superficial contact with supervisors, co-workers and the public.  (Tr. 18, 518.) This shows that he did not disregard the evidence of functional limitations attributable to mental, emotional or intellectual deficiencies.

This record, as a whole, constitutes substantial evidence to support the ALJ's RFC assessment regarding Plaintiff's mental abilities.  As with her physical conditions, Plaintiff's mental impairments imposed only mild or moderate functional limitations, were controlled or controllable by treatment or medication, or were adequately accounted for with the restrictions included in the ALJ's RFC assessment.

18

V.

After a careful review of the evidence and all arguments presented, the Court finds that Plaintiff's arguments for reversal are without merit and that the record as a whole contains substantial evidence upon which the ALJ could rely in reaching his decision.

ACCORDINGLY, the final decision of the Commissioner is **affirmed** and Plaintiff's case is **dismissed** with prejudice.

IT IS SO ORDERED this 16th day of September, 2009.


_____
UNITED STATES MAGISTRATE JUDGE